**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

CONSUMER FINANCIAL PROTECTION
BUREAU,

       Petitioner,

v.

    PURPOSE FINANCIAL, INC.,

       Respondent.

Case No. 7:24-cv-03206

**PETITIONER CONSUMER FINANCIAL PROTECTION BUREAU'S OPPOSITION TO
RESPONDENT PURPOSE FINANCIAL, INC.'S MOTION TO DISMISS**

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

Introduction ................................................................................................................... 1

Background .................................................................................................................... 2

Argument ....................................................................................................................... 3

    I.      The Court should reject Purpose's procedurally improper effort to get this
           summary proceeding dismissed. ...................................................................... 3

    II.     The Bureau's funding is valid and provides no grounds for dismissal. ......................... 4

        A.    Under its plain meaning, the "combined earnings of" the Federal Reserve
             System refers to the System's income. .................................................... 6

        B.    Purpose's bespoke definition of "earnings" is wholly atextual. ................................. 8

        C.    The wider statutory scheme confirms the Bureau's reading and refutes
             Purpose's. .......................................................................................... 13

        D.    Dismissal would not be warranted in any event. ....................................... 16

Conclusion ................................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**        **Page(s)**

*Abramski v. United States*,
   573 U.S. 169 (2014) .................................................................................... 13

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
   601 U.S. 416 (2024) ........................................................................... 1, 2, 8, 9

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
   104 F.4th 930 (5th Cir. 2024) ................................................................. 1, 17

*Collins v. Yellen*,
   594 U.S. 220 (2021) .................................................................................... 17

*Guerrero v. Ollie's Bargain Outlet, Inc.*,
   —F.4th—, 2024 WL 3928094 (4th Cir. Aug. 26, 2024) .............................. 4

*In re Admin. Subpoena Blue Cross Blue Shield of Mass., Inc.*,
   400 F. Supp. 2d 386 (D. Mass. 2005) ......................................................... 3

*Kennedy v. St. Joseph's Ministries, Inc.*,
   657 F.3d 189 (4th Cir. 2011) ..................................................................... 10

*Nat'l Credit Union Admin. v. Beacon Cmty. Fed. Credit Union*,
   502 F. Supp. 182 (N.D. Ill. 1980) ............................................................... 4

*Palisades Collections LLC v. Shorts*,
   552 F.3d 327 (4th Cir. 2008) ..................................................................... 13

*Solis v. Food Emps. Lab. Rels. Ass'n*,
   644 F.3d 221 (4th Cir. 2011) ....................................................................... 3

*Springfield Parcel C, LLC v. United States*,
   124 Fed. Cl. 163 (2015) ............................................................................. 17

*United States v. Clarke*,
   573 U.S. 248 (2014) ..................................................................................... 3

*United States v. George*,
   946 F.3d 643 (4th Cir. 2020) ....................................................................... 6

*United States v. Markwood*,
   48 F.3d 969 (6th Cir. 1995) ......................................................................... 4

*United States v. Morrison*,
   449 U.S. 361 (1981) ................................................................................... 18

*United States v. Zadeh,*
    2015 WL 418090 (N.D. Tex. Jan. 31, 2015)...................................................................... 4

**Statutes**

12 U.S.C. § 243 ........................................................................................................................ 13

12 U.S.C. § 289 .................................................................................................................... 9, 15

12 U.S.C. § 289(a) ............................................................................................................ 5, 8, 13

12 U.S.C. § 289(a)(1) ................................................................................................................. 5

12 U.S.C. § 289(a)(2) ................................................................................................................. 5

12 U.S.C. § 289(a)(3) ................................................................................................................. 5

12 U.S.C. § 289(a)(3)(B) ........................................................................................................ 5, 8

12 U.S.C. § 5390(n)(2) ............................................................................................................... 7

12 U.S.C. § 5465(c) .................................................................................................................... 7

12 U.S.C. § 5491(a) .................................................................................................................. 13

12 U.S.C. § 5497(a)(1) ................................................................................................... 5, 8, 13, 16

12 U.S.C. § 5497(a)(2)(A) ........................................................................................................ 15

12 U.S.C. § 5497(d)(2)(A) ........................................................................................................ 15

12 U.S.C. § 5497(e) .................................................................................................................. 15

12 U.S.C. § 5511 ....................................................................................................................... 14

12 U.S.C. § 5511(a) .................................................................................................................... 2

12 U.S.C. § 5562(e) .................................................................................................................... 2

15 U.S.C. § 78u-6(g)(5)(D) ........................................................................................................ 7

31 U.S.C. § 1341 ....................................................................................................................... 17

**Rules**

Fed. R. Civ. P. 7(a) ..................................................................................................................... 4

Fed. R. Civ. P. 12(b) ................................................................................................................... 4

Fed. R. Civ. P. 81(a)(5) .............................................................................................................. 3

## Other Authorities

156 Cong. Rec. 13195 (2010) ........................................................................... 14

Cong. Res. Serv., *Why Is the Federal Reserve Operating at a Loss?* (Jan. 3, 2023) .................. 10

Consumer Financial Protection Bureau, *CFO update through the first quarter of fiscal year 2024* (March 1, 2024, rev. July 31, 2024) ............................................................... 15

*Earnings*, Black's Law Dictionary (9th ed. 2009) ............................................... 6, 7

*Earnings*, Black's Law Dictionary (12th ed. 2024) ................................................ 6

*Earnings*, Investopedia.com ........................................................................ 9, 10

*Earnings*, Oxford English Dictionary (online ed. 2024) ........................................... 6

Federal Reserve, *FAQ: Who owns the Federal Reserve?* (last updated Mar. 1, 2017) ............... 10

Federal Reserve, *Federal Reserve Balance Sheet: Factors Affecting Reserve Balances – H.4.1* (Sept. 26, 2024) ......................................................................... 12

Federal Reserve, *The Federal Reserve Banks Combined Financial Statements as of and for the Years Ended December 31, 2010 and 2009* (2010) ....................................... 14

Federal Reserve, *Federal Reserve Banks Combined Financial Statement for the Years Ended December 31, 2023 and 2022* (2024) ......................................................... 12

Federal Reserve, *Federal Reserve Banks Combined Quarterly Financial Report* (Mar. 31, 2024) ..................................................................................... 12

Federal Reserve, *Federal Reserve Board announces preliminary financial information for the Federal Reserve Banks' income and expenses in 2023* (Jan. 12, 2024) ......................... 5, 7, 15, 16

Federal Reserve, *Financial Accounting Manual for Federal Reserve Banks* (Apr. 2024) ........... 11

Federal Reserve System, *The Fed Explained: What the Central Bank Does* (Aug. 2021) ............. 7

Gov't Accountability Off., *Federal Reserve System: The Surplus Account* (Sept. 2002) ........... 15

Oxford Dictionary of Accounting (4th ed. 2010) ..................................................... 9

S. Rep. No. 111-176 (2010) ........................................................................... 14

## INTRODUCTION

In this action, the Consumer Financial Protection Bureau seeks to enforce a civil investigative demand (CID) against Purpose Financial, Inc., a payday lender. The Bureau issued that CID to Purpose in early 2023 as part of its ongoing investigation of potential legal violations in Purpose's short-term and small-dollar lending practices. For a year and a half, Purpose refused to fully comply with the Bureau's CID based on a series of incorrect claims that the Bureau does not have appropriate funding to carry out its statutory duties, including to investigate possible violations of federal consumer financial law. In May, the Supreme Court—in a 7–2 opinion authored by Justice Thomas—rejected the first argument Purpose relied on and held that the Bureau's statutory funding mechanism does not violate the Appropriations Clause. *See CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.* (*CFSA*), 601 U.S. 416 (2024); *see also Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 104 F.4th 930 (5th Cir. 2024) (on remand, "declaring that the Bureau's funding structure . . . is constitutional").

Undeterred by that decision, Purpose now purports to find a new fault with the Bureau's funding. As an initial matter, the Court could reject that argument without even reaching its merits because Purpose has raised it in a procedurally improper motion to dismiss this summary subpoena-enforcement action. If the Court does reach the merits, it should not adopt Purpose's implausible reading of the Bureau's organic statute. Purpose argues that when Congress funded the Bureau with the "earnings" of the Federal Reserve System, it actually intended the Bureau to receive only the "surplus" of funds that would otherwise be deposited in the general fund of the Treasury, after the payment of (non-Bureau) expenses and other obligations. So, in Purpose's view, the Bureau can only validly draw funds using the permanent appropriation Congress gave it when the Federal Reserve System is generating enough "profit" to send remittances to the Treasury. This reading contradicts the relevant statute's plain language, is inconsistent with the

wider statutory scheme, and would be utterly unworkable in practice. The Court should deny the motion to dismiss.

## BACKGROUND

The Bureau—the primary enforcer of federal consumer financial laws, 12 U.S.C. § 5511(a)—is investigating the short-term and small-dollar lending practices of Respondent Purpose Financial, Inc. *See* Decl. of Gregory Nodler in Supp. of Pet. to Enforce Civil Investigative Demand ¶¶ 4–5, 7, ECF No. 1-1. Among other things, the Bureau is investigating whether Purpose has violated federal law by improperly inducing borrowers to renew or refinance their loans, understating the full cost of serially "rolling over" loans, and misrepresenting the true nature of their loan products. *Id.* ¶ 7. As part of that investigation, the Bureau issued a CID—a type of administrative subpoena—to Purpose in February 2023. *Id.* ¶¶ 6, 10.

In April 2023, while negotiations over the scope of the CID were ongoing, Purpose informed the Bureau that it would no longer cooperate with the investigation. *Id.* ¶¶ 27–30. Purpose explained that it would not make any further production until the Supreme Court resolved a constitutional challenge to the Bureau's statutory funding mechanism under the Appropriations Clause, which was then pending before the Supreme Court in *CFSA*. *Id.* ¶¶ 27–30. Because Purpose's refusal to comply with the Bureau's CID burdened and impeded its investigation, *id.* ¶ 34, in June 2023 the Bureau petitioned this Court to enforce the CID against Purpose. *See* Pet., ECF No. 1; *see also* 12 U.S.C. § 5562(e) (authorizing Bureau to petition federal courts to order enforcement of CIDs). At Purpose's request, the Court stayed this proceeding pending the decision in *CFSA*. *See* Stay Mot., ECF No. 15; Stay Op., ECF No. 28.

In May 2024, the Supreme Court issued its decision in *CFSA* and upheld the validity of the Bureau's statutory funding mechanism. *See* 601 U.S. at 435. Following that decision, the

parties informed the Court that Purpose no longer declined to comply with the Bureau's CID based on the constitutional challenge the Supreme Court had rejected in *CFSA*. *See* Status Report, ECF No. 30. Over the next several months, the parties attempted to negotiate modifications to the CID, but they eventually reached an impasse on certain issues. *See* Status Report, ECF No. 43. In September, Purpose responded to the Bureau's petition to enforce the CID, *see* ECF No. 46, and concurrently moved to dismiss the petition based on a purported new fault it has found with the Bureau's funding, *see* Mot. to Dismiss, ECF No. 45; Memo. in Supp. of Mot. to Dismiss, ECF No. 45-1 ("MTD Br.").

## ARGUMENT

### I. The Court should reject Purpose's procedurally improper effort to get this summary proceeding dismissed.

As an initial matter, the Court can reject Purpose's new objection to the Bureau's funding without even reaching its merits because Purpose has raised it in an improper motion that is inappropriate in this summary proceeding and without basis in the Federal Rules.

Subpoena-enforcement proceedings such as this one are meant "to be summary in nature." *United States v. Clarke*, 573 U.S. 248, 254 (2014) (internal quotation marks omitted). They begin with the filing of a petition to enforce (rather than a complaint), and the "sharply limited" role of the court is to decide whether to enforce the subpoena. *See Solis v. Food Emps. Lab. Rels. Ass'n*, 644 F.3d 221, 226 (4th Cir. 2011); *cf. In re Admin. Subpoena Blue Cross Blue Shield of Mass., Inc.*, 400 F. Supp. 2d 386, 388 (D. Mass. 2005) (treating petition itself as a dispositive motion because "the matter involving the subpoena constitutes the entire case before the Court"). While Purpose is correct, MTD Br. 1 n.1, that the Federal Rules of Civil Procedure generally apply to subpoena-enforcement actions unless excepted by statute, local rule, or court order, *see* Fed. R. Civ. P. 81(a)(5), those rules "were written for post-complaint litigation,"

*United States v. Markwood*, 48 F.3d 969, 982 (6th Cir. 1995). For that reason, "[m]ost of the Federal Rules of Civil Procedure are simply inapplicable to the pre-complaint enforcement of an administrative subpoena." *Id.*

Rule 12(b)(6) is one of those inapplicable rules. Motions under any provision of Rule 12(b) must be directed to "a claim for relief *in any pleading*." Fed. R. Civ. P. 12(b) (emphasis added). In subpoena-enforcement actions like this one, however, there is no "pleading" to which a Rule 12 motion can be directed. *See* Fed. R. Civ. P. 7(a) (providing that "only" a list of specific types of pleading—not including petitions to enforce administrative subpoenas—are allowed). Rule 12(b)(6) specifically "authorizes dismissal of a complaint for failure to state a claim upon which relief can be granted," so the purpose of a motion under the rule "is to test the sufficiency of a complaint." *Guerrero v. Ollie's Bargain Outlet, Inc.*, —F.4th—, No. 22-1402, 2024 WL 3928094, at *2 (4th Cir. Aug. 26, 2024) (internal quotation marks omitted). A motion to dismiss—like the one Purpose filed here—is thus procedurally improper. *See United States v. Zadeh*, No. 4:14-cv-105-O, 2015 WL 418090, at *5 (N.D. Tex. Jan. 31, 2015), *aff'd as modified and remanded*, 820 F.3d 746 (5th Cir. 2016) ("Due to the Court's limited role in reviewing administrative subpoenas for enforcement, the Court does not consider Rule[] 12(b)(6) . . . to be applicable."); *Nat'l Credit Union Admin. v. Beacon Cmty. Fed. Credit Union*, 502 F. Supp. 182, 185 (N.D. Ill. 1980) (reasoning that, although "the recipient of an agency subpoena . . . may challenge the reasons behind its issuance," it "is not entitled to an order . . . dismissing the petition to enforce"). The Court should deny the motion for this reason alone.

## II.    The Bureau's funding is valid and provides no grounds for dismissal.

Even if Purpose could move under Rule 12 to dismiss this CID-enforcement proceeding, the motion here fails on the merits. In its motion to dismiss, Purpose appears undaunted by the recent Supreme Court decision upholding the Bureau's funding under the Appropriations Clause

and insists that a problem remains. It makes a new argument against the Bureau's funding mechanism, this time relying on the portion of the Dodd-Frank Act authorizing the Bureau to draw funds from "the combined earnings of the Federal Reserve System." 12 U.S.C. § 5497(a)(1).

Purpose reads the phrase "combined earnings" in a very specific—and, as will be explained, obviously incorrect—way. It says that those "earnings" must refer to the Federal Reserve System's "surplus" funds that "would otherwise be deposited into the general fund of the Treasury." MTD Br. 1. Under the Federal Reserve Act, those surpluses—or excess earnings—are what remains after (1) covering the Banks' expenses (including assessments levied by the Federal Reserve Board); (2) paying dividends to the Banks' private-bank shareholders; and (3) making deposits, up to a specified cap, into each Bank's surplus account. 12 U.S.C. § 289(a)(1)–(3) (providing for payment of those obligations in that order). If funds remain after making all those payments, the Federal Reserve Banks transfer those excess earnings for deposit in the Treasury's general fund on a weekly basis. *Id.* § 289(a)(3)(B); *see also* Federal Reserve, *Federal Reserve Board announces preliminary financial information for the Federal Reserve Banks' income and expenses in 2023* (Jan. 12, 2024)[1] (describing weekly remittances) ("FRB 2024 Release").

Recently, and due largely to the impact of changing interest rates resulting from the Federal Reserve's implementation of monetary policy, the Reserve Banks have not consistently generated excess net earnings and thus "[m]ost . . . suspended weekly remittances to the U.S. Treasury in September 2022." FRB 2024 Release (also noting that "certain Reserve Banks . . . [have] continued to remit excess earnings to the U.S. Treasury intermittently"). In Purpose's

---

[1] *Available at* www.federalreserve.gov/newsevents/pressreleases/other20240112a.htm.

5

view, this means the Bureau cannot validly draw and spend any money at this time to carry out the consumer-protective duties Congress assigned to it.

Purpose is wrong. Its self-serving interpretation of the word "earnings" is contrary to ordinary meaning, lacks support in the text of Section 5497 or the broader statutory context, and would be unworkable to boot. None of Purpose's arguments prove otherwise; they demonstrate only Purpose's desperation to avoid complying with the Bureau's CID and forestall any investigation into its potential unlawful practices. The Court should reject them.

### A. Under its plain meaning, the "combined earnings of" the Federal Reserve System refers to the System's income.

"When interpreting a statute, courts must first and foremost strive to implement congressional intent by examining the plain language of the statute"—which is generally "determined by reference to its words' ordinary meaning at the time of the statute's enactment." *United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020) (internal citations and quotation marks omitted). Purpose agrees (at 7) that the Court should look to the ordinary meaning of "earnings" to interpret the phrase "combined earnings of the Federal Reserve System" in § 5497.

A common, everyday meaning of "earnings"—both now and at the time the Bureau's statute was enacted—is "revenue" or "income" generated from labor, services, or investments. *See Earnings*, Black's Law Dictionary (12th ed. 2024) ("Revenue gained from labor or services, from the investment of capital, or from assets. See INCOME."); *Earnings*, Black's Law Dictionary (9th ed. 2009) (same); *Earnings*, Oxford English Dictionary (online ed. 2024) ("[T]he money made through working, trade or business activity, etc."; "The income produced by invested capital.").

That ordinary meaning fits this statute to a T. The bulk of the money generated by the Federal Reserve comes from "interest earned on the securities [the Federal Reserve] owns—

securities acquired in the course of the Federal Reserve's open market operations." Federal Reserve System, *The Fed Explained: What the Central Bank Does* 4 (Aug. 2021).[2] Most of the rest comes from "fees received for priced services provided to depository institutions—such as check clearing, funds transfers, and automated clearinghouse operations." *Id.* at 4. The statute's reference to the Federal Reserve System's "combined earnings" refers to the total "[r]evenue gained from . . . services, from the investment of capital, or from assets." *Earnings*, Black's Law Dictionary (9th ed. 2009).

Confirming this interpretation, the term "earnings" is used in just the same way throughout the Dodd-Frank Act to refer to the income or money earned by particular agencies or other entities. *See* Pub. L. No. 111-203, § 210(n)(2) (directing the FDIC to deposit "interest and other *earnings* from investments" into Orderly Liquidation Fund) (codified at 12 U.S.C. § 5390(n)(2)); *id.* § 806(c) (authorizing Reserve Banks to "pay *earnings* on balances maintained by or on behalf of" certain systemically important financial entities) (codified at 12 U.S.C. § 5465(c)); *id.* § 922(a) (requiring SEC to report "the amount of *earnings* on investments" made from its Investor Protection Fund) (codified at 15 U.S.C. § 78u-6(g)(5)(D)).

Although last year the Federal Reserve's "sum total of expenses exceeded estimated earnings," the Federal Reserve continues to generate many billions of dollars in earnings, much of it from interest income on securities. FRB 2024 Release (reporting that income from this source alone "totaled $163.8 billion in 2023"). The statute authorizes the Bureau to draw and spend money from those earnings.

---

[2] *Available at* www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf.

**B.     Purpose's bespoke definition of "earnings" is wholly atextual.**

Purpose offers a different, cramped, and highly idiosyncratic understanding of "earnings" that it hopes will let it avoid compliance with the Bureau's investigative demand here. In particular, Purpose claims that "combined earnings," as the term is used in § 5497, means the amount of the Federal Reserve System's earnings that would otherwise go to Treasury—that is, the amounts that remain after the Federal Reserve Banks pay their necessary expenses (somehow other than the expense of paying assessments levied to fund the Bureau), dividends to their shareholders, and deposits into their surplus funds. *See* MTD Br. 6. Purpose claims this represents the accepted and "ordinary meaning" of the word "earnings." That view is entirely without basis.

Purpose first relies on the Supreme Court's opinion in *CFSA*, which it reads to hold that the Bureau is "funded by 'combined earnings' from the 'surplus funds in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury"—in other words, that the Bureau's funding can only be drawn from the pot of money left after paying for the System's non-Bureau expenses and obligations. MTD Br. 1 (quoting *CFSA*, 601 U.S. at 425–26, 435, 441); *see also id.* at 7. The Court held nothing of the sort, as even a brief review of its opinion confirms. The Court discussed the Federal Reserve's transfers to the Treasury only to address the "threshold" question of whether the Bureau's funding transfers from the Federal Reserve are even "subject to the requirements of the Appropriations Clause[,]" given that the Clause limits when money may be "'drawn *from the Treasury*.'" *CFSA*, 601 U.S. at 425 (quoting Art. I, § 9, cl. 7) (emphasis added). After noting the parties' agreement that the Appropriations Clause applies, the Court said:

> The Bureau draws money from the Federal Reserve System. 12 U.S.C.
> § 5497(a)(1). And, surplus funds in the Federal Reserve System would otherwise
> be deposited into the general fund of the Treasury. § 289(a)(3)(B). Whatever the

scope of the term 'Treasury' in the Appropriations Clause, money otherwise destined for the general fund of the Treasury qualifies.

*Id.* In making this observation, the Court reasoned only that the Bureau's funding was subject to the Appropriations Clause because it came from a source with a direct tie to the Treasury. The Court did not say that the "combined earnings of the Federal Reserve System" used to fund the Bureau must come from the net earnings remitted weekly to the Treasury, nor did it otherwise weigh in on where assessments for the Bureau fall in the Federal Reserve System's ordered management of its financial obligations, 12 U.S.C. § 289. And, contrary to Purpose's claims here, the Court simply did not purport to interpret the term "combined earnings." That's hardly surprising, given that the parties did not dispute the term's definition and the question presented did not encompass it. *CFSA* simply does not get Purpose where it needs to go.

Purpose next says that its interpretation of earnings—which covers a subset of the Federal Reserve System's profits—is consistent with ordinary meaning, relying on a British dictionary of accounting, a finance encyclopedia, a federal income tax treatise, a stock index glossary, and the secondary definitions offered by two online dictionaries. *See* MTD Br. 7–9. To begin, Purpose does not address the fact that the first two definitions in its online dictionaries— "something (as wages) earned" in Merriam-Webster and "salary or wages" in the American Heritage Dictionary—support the Bureau. Purpose simply ignores them. Next, even Purpose's cited accounting dictionary notes that "there has been considerable debate as to [the] definition" of "earnings," even as used in the specialized context of private-company accounting practices. *Oxford Dictionary of Accounting*, at 161 (4th ed. 2010). Of course, Purpose is right that, in particular circumstances, "earnings" can be used to refer to a private company's "after-tax net income" or "profits." *See, e.g.*, *Earnings*, Investopedia.com.[3]

---

[3] *Available at* www.investopedia.com/terms/e/earnings.asp.

For two reasons, that doesn't help Purpose. First, Purpose's argument overlooks that "in all statutory construction, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011). Here, there's no reason to think that Congress, when providing for the funding of a new agency from the money generated by the country's central bank, had in mind a specialized meaning of "earnings" that can sometimes apply in the very different context of private companies.[4]

Second, Purpose's position is not actually that the statute's reference to "earnings" means "after-tax net income" or "profits," as it sometimes does in the private-company context. Purpose urges a far narrower understanding of "earnings"—namely, what's left over after the payment of (among other things) dividends to stockholders of the Reserve Banks. But even for private companies, "earnings" are not what's left over after dividends are paid; rather, earnings are used to *pay* dividends. *See, e.g.*, *Earnings*, Investopedia.com (explaining that a "company's earnings"—in that context, "its profits"—"can be used to reward stockholders with dividends"). In other words, Purpose first ignores the ordinary meaning of "earnings" in favor of a specialized definition sometimes used for private companies, then abandons that definition for an even narrower one with no basis in any recognized understanding of the term. Whatever else this may be, it is not a sound way to determine the meaning of statutory text.

---

[4] Indeed, the Federal Reserve System is unlike private companies in a variety of ways. As the nation's central bank, its primary job is implementing monetary policy, not—unlike most private enterprises—"profit-maximizing." Cong. Res. Serv., *Why Is the Federal Reserve Operating at a Loss?* (Jan. 3, 2023), https://crsreports.congress.gov/product/pdf/IN/IN12081. And unlike private companies, "[l]osses do not affect the Fed's ability to honor its liabilities." *Id.* Moreover, though Federal Reserve Banks have private-bank shareholders that receive dividends, "owning Reserve Bank stock is quite different from owning stock in a private company." Federal Reserve, *FAQ: Who owns the Federal Reserve?*, https://www.federalreserve.gov/faqs/about_14986.htm (last updated Mar. 1, 2017) (explaining that ownership of a certain amount of stock is required by law for member banks, and that "[t]he Reserve Banks are not operated for profit").

Purpose next appeals to what it calls "[a]pplicable accounting standards"—particularly the Financial Accounting Manual for Federal Reserve Banks and Generally Accepted Accounting Principles (or GAAP). *See* MTD Br. 8–9. Neither source helps Purpose.

Start with the Financial Accounting Manual. It explains that the Banks' income—not to be confused with a term that nets out expenses like "profits"—is the sum of the various "earnings" of the Banks. Federal Reserve, *Financial Accounting Manual for Federal Reserve Banks* 47–48 (Apr. 2024)[5] (explaining that "income" includes, among other things, "[i]nterest earnings on loans," "earnings from investments denominated in foreign currencies," and "other earnings"). By contrast, the Accounting Manual describes the money remitted to the Treasury as "*excess* earnings"—that is, the money left after deducting "the cost of operations, payment of dividends, and reservation of an amount necessary to maintain [the Banks'] surplus" account. *Id.* at 53 (emphasis added). This "excess earnings" formulation makes clear that remittances to the Treasury make up just a subset of the Federal Reserve System's overall earnings.

Purpose's reliance on GAAP fares no better. Purpose says that the Federal Reserve Board uses GAAP to prepare its financial statements, and that under GAAP "earnings means *net* income" or "profit." MTD Br. 8 (cleaned up). But while the Board's approach to preparing its annual financial statements is generally consistent with GAAP, the Board has adopted specific accounting principles "that differ from [GAAP]" in certain respects, "[d]ue to the unique nature of the Reserve Banks' powers and responsibilities as part of the nation's central bank . . . ." Federal Reserve, *Federal Reserve Banks Combined Financial Statement for the Years Ended December 31, 2023 and 2022* at 9 (2024)[6] ("2023 Annual Statement").

---

[5] *Available at* https://www.federalreserve.gov/aboutthefed/files/bstfinaccountingmanual.pdf.

[6] *Available at* https://www.federalreserve.gov/aboutthefed/files/combinedfinstmt2023.pdf.

And in fact, the Board's financial statements—which Purpose expressly relies on—confirm that the Federal Reserve uses "earnings" to mean money earned by the Reserve Banks before they cover costs or make other payments. For example, Purpose cites weekly statements on the Federal Reserve balance sheet. MTD Br. 9–10. Those statements clarify that any money remitted to the Treasury represents the Banks' "*residual net* earnings," and that Banks cease making remittances "when *earnings* are not sufficient to provide for the cost of operations, payment of dividends, and maintaining surplus." Federal Reserve, *Federal Reserve Balance Sheet: Factors Affecting Reserve Balances – H.4.1*, fig. 6 & n.8 (released Sept. 26, 2024)[7] (emphasis added) ("Federal Reserve Balance Sheet").

The Board's quarterly and annual financial reports make the same point: The March 2024 quarterly report that Purpose cites refers to Treasury remittances as "*excess* earnings." Federal Reserve, *Federal Reserve Banks Combined Quarterly Financial Report* 24 (Mar. 31, 2024)[8] (emphasis added). The annual report from the previous year again explains that weekly remittances to the Treasury are suspended "if earnings become less than the costs of operations, payment of dividends, and reservation of an amount necessary to maintain the Reserve Banks' allocated portion of the aggregate surplus limitation. 2023 Annual Statement at 21–22; *see also* MTD Br. 2, 12 (reproducing graph from Federal Reserve Board publication describing System's current shortfalls as "[c]ost of operations *in excess of earnings*" (emphasis added)). Far from supporting Purpose's position, the language used across the Federal Reserve's financial statements and similar materials reflects the understanding that "earnings" means simply income or money earned.

---

[7] *Available at* https://www.federalreserve.gov/releases/h41/20240926/.

[8] *Available at* https://www.federalreserve.gov/aboutthefed/files/quarterly-report-20240517.pdf.

C.     **The wider statutory scheme confirms the Bureau's reading and refutes Purpose's.**

"[A] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Abramski v. United States*, 573 U.S. 169, 179 n.6 (2014); *accord Palisades Collections LLC v. Short*s, 552 F.3d 327, 331 (4th Cir. 2008). Here, the broader statutory context confirms that the term "combined earnings" in § 5497 means all of the income or money earned, not the gerrymandered definition Purpose has concocted.

To begin, the statutes governing how the Federal Reserve System pays its obligations— including funding the Bureau—undermines Purpose's favored interpretation of "earnings." The Federal Reserve Act establishes a waterfall for the use of Federal Reserve Banks' earnings, and transfers to the Bureau fall in the first tier. Under this waterfall, the Banks first satisfy all their "necessary expenses," before paying stockholders their dividend entitlement, depositing funds in the Banks' surplus funds until they reach a cap, and then remitting remaining "net earnings" to Treasury. 12 U.S.C. § 289(a). The necessary expenses of the Banks include semiannual assessments that the Federal Reserve Board levies on the Banks "to pay [the Board's] estimated expenses." *Id.* § 243. And, under the CFPA, the expenses of the Federal Reserve Board in turn include the amount the Board must transfer to the Bureau from the Federal Reserve System's earnings to meet the Bureau's funding needs. *See id.* § 5497(a)(1) (providing the Board "shall transfer" the amount the Bureau requests). Indeed, Congress "established [the Bureau] in the Federal Reserve System[.]" *Id.* § 5491(a). Thus, the Federal Reserve Board has since the Bureau's creation levied assessments on the Banks to obtain funding needed to cover both the

Board's own expenses and the funds it must transfer to the Bureau[9]—and those assessments are "necessary expenses" of the Banks, paid first under the Federal Reserve Act.

Treating the Bureau's funding as a "necessary expense" of the Federal Reserve is also consistent with the scheme Congress created when it established the Bureau. Congress created the Bureau after the 2008 financial crisis to prevent future crises by ensuring that the federal consumer financial laws are adequately enforced. *See, e.g.*, 12 U.S.C. § 5511 (specifying purposes and objectives of the Bureau). Congress deemed "the assurance of adequate funding" to be "absolutely essential" for the new agency, and so it funded the Bureau as it did. S. Rep. No. 111-176, at 163 (2010); *see also* 156 Cong. Rec. 13195 (2010) (statement of Sen. Dodd) ("The conference report requires the Federal Reserve System to *automatically fund* the CFPB. . . . This will ensure that the CFPB has the resources it needs to perform its functions . . . .") (emphasis added).

Giving the statutory language "combined earnings" its ordinary meaning—money earned—is consistent with this context because it ensures that the Bureau is adequately funded from the money generated by the Federal Reserve. By contrast, on Purpose's view, the Congress that created the Bureau set up the new agency so that it would be intermittently and unpredictably mothballed, potentially unable to carry out its statutory role overseeing the financial markets at precisely those times that economic disruptions were causing shortfalls at the Federal Reserve.[10] That is not a plausible reading of the statute.

---

[9] *See, e.g.*, Federal Reserve, *The Federal Reserve Banks Combined Financial Statements* as *of and for the Years Ended December 31, 2010 and 2009* at 5 (2010), https://www.federalreserve.gov/aboutthefed/files/BSTcombinedfinstmt2010.pdf (listing "Bureau of Consumer Financial Protection" among "Assessments" under the Banks' combined Operating Expenses for 2010, the Bureau's first year of operations).

[10] The Congress that enacted Dodd-Frank would surely have been aware, particularly in the

Purpose tries to wish this problem away by pointing out, MTD Br. 2, 6, that the statute funding the Bureau authorizes it to seek additional appropriations from Congress. *See* 12 U.S.C. § 5497(e). But that authorization was very obviously meant for a situation where additional funds were needed above what the Bureau could receive in transfers from Federal Reserve earnings—which Section 5497(a)(2) caps at a specified amount,[11] *id.* § 5497(a)(2)(A). That is why subsection (e) requires the Director, in requesting appropriations under that section, to report to Congress on "the extent to which the funding needs of the Bureau are anticipated *to exceed the level of the amount set forth in subsection (a)(2)*." 12 U.S.C. § 5497(e) (emphasis added). Purpose's interpretation of convenience once again cannot be squared with the statutory language. And it would be completely unworkable, including because it would require the Bureau and Congress to forecast shortfalls at the Federal Reserve with sufficient time to appropriate funds for the Bureau's continued operations.

And that's not the only workability problem Purpose's interpretation of the term "earnings" would pose for the Federal Reserve, the Bureau, or reviewing courts. Each of the 12 Reserve Banks remits its excess net earnings to the Treasury on a weekly basis. *See* FRB 2024 Release; 12 U.S.C. § 289. (While Purpose claims the last of those transfers occurred in August

---

immediate wake of the 2008 financial meltdown, of the possibility of such shortfalls. *See* Gov't Accountability Off., *Federal Reserve System: The Surplus Account* 11 (Sept. 2002), https://www.gao.gov/assets/gao-02-939.pdf (reporting that, from 1989 to 2001, "11 of the 12 Reserve Banks reported a total of 352 weeks in which earnings were less than expenses and losses"). The possibility of shortfalls is the reason that each Reserve Bank maintains a surplus fund, "to act as a cushion to absorb losses." *Id.* at 3.

[11] The cap is set at 12 percent of the Federal Reserve System's operating expenses as reported in the Board's 2009 Annual Report, adjusted according to a specialized measure of inflation. 12 U.S.C. § 5497(d)(2)(A). In fiscal year 2024, that inflation-adjusted cap is equal to $785.4 million. *See* Consumer Financial Protection Bureau, *CFO update through the first quarter of fiscal year 2024* (March 1, 2024, rev. July 31, 2024), https://files.consumerfinance.gov/f/documents/cfpb_cfo-update_report_fy-2024_q1.pdf.

15

2022, *see* MTD Br. 2, 11, that's not true. The 12 Reserve Banks remit money independently, and certain Banks have continued to remit excess earnings to the Treasury intermittently over the past two years. *See, e.g.*, FRB 2024 Release; Federal Reserve Balance Sheet, tbl. 6 (reporting that, for week ending on September 25, 2024, alone, the Federal Reserve Bank of Atlanta remitted $33 million to the Treasury).) But by statute, the Bureau draws money either annually or quarterly. 12 U.S.C. § 5497(a)(1). How, in Purpose's view, would the Bureau—or a reviewing court—determine how much it could validly draw in a given year or quarter?

Purpose's criticism of the Bureau's past funding requests underscores the problem: In Purpose's view, the Bureau's first unauthorized request came in October 2022, after some of the Federal Reserve Banks started suspending remittances to the Treasury. *See* MTD Br. 3, 13. But across 2022 as a whole, the Banks remitted tens of billions of dollars to the Treasury, even after deducting the amount of the "deferred assets" they began accruing that year. *See* FRB 2024 Release. Why wouldn't those "combined earnings" have been available to satisfy the Bureau's funding request, even under Purpose's (incorrect) reading of the statute? For that matter, why, under Purpose's erroneous view, would the Bureau be unable to validly draw from the many millions of dollars that Reserve Banks continue to send to the Treasury even now? Purpose doesn't say how that budgeting should work or even acknowledge this inconsistency in its own argument.

To make matters worse, Purpose's reading would require courts to play auditor not only to the Federal Reserve but to the Bureau—since they would also need to somehow determine when the Bureau drew the specific funds it spent on a challenged agency action. These absurd consequences provide another reason, if any were needed, to reject Purpose's view.

### D. Dismissal would not be warranted in any event.

As explained above, dismissal of the subpoena-enforcement action is not the proper

remedy for any defect with the Bureau's CID. And even if dismissal were available, it would not be warranted for the alleged defect here—a problem with the Bureau's statutory funding source.

While Purpose broadly asserts that any constitutional or statutory issue renders executive action invalid, *see* MTD Br. 4, that's plainly incorrect. *See, e.g.*, *Collins v. Yellen*, 594 U.S. 220, 258 (2021) (rejecting argument that an unconstitutional restriction on the President's removal power automatically renders agency action invalid); *Id.* at 261–71 (Thomas, J., concurring) (elaborating on why "[t]he Government does not necessarily act unlawfully even if a removal restriction is unlawful in the abstract").

And for problems with an agency's funding, in particular, neither Congress nor courts have provided that invalidation is the appropriate remedy. Congress has the power of the purse, and, in establishing the consequences for unauthorized expenditures, it has not—contrary to Purpose's claims (at 4)—provided that actions taken using funds that were not actually appropriated must be undone. *See generally* Anti-Deficiency Act, 31 U.S.C. § 1341 *et seq.* (nowhere providing for invalidation of past acts taken without lawful appropriations).

Purpose seeks support in the Fifth Circuit's since-reversed decision in *CFSA* and the Federal Circuit's decision in *Springfield Parcel C, LLC v. United States*, 124 Fed. Cl. 163, 190 (2015), but neither helps its case. As to the first, while Purpose claims *CFSA* was reversed on other grounds and its remedial holding remains intact, MTD Br. 5, that incorrect. The Fifth Circuit itself concluded that the Supreme Court had "reversed [the panel's] judgment in its entirety." *See CFSA*, 104 F.4th at 930 (reinstating judgment only as to issues on which it ruled in favor of the Bureau defendants).

As to the second, the court in *Springfield Parcel* held only that a government agency without an appropriation could not validly enter a contract requiring it to pay money. 124 Fed.

Cl. at 190. Purpose offers no good reason to transplant that holding to the entirely different context of an ongoing government investigation. Dismissing this action would not undo the Bureau's expenditures associated with pursuing the investigation or restore any funds to the federal fisc. Moreover, that remedy would fail to take sufficient account of the interests of other parties, including the consumers affected by the practices that the Bureau is investigating here. *See generally United States v. Morrison*, 449 U.S. 361, 364 (1981) (explaining that courts must craft remedies that do "not unnecessarily infringe on competing interests").

## CONCLUSION

For all these reasons, the Court should deny Purpose's motion to dismiss.


Dated:  October 3, 2024                    Respectfully Submitted,

                                           Attorneys for Petitioner,

                                           Consumer Financial Protection Bureau

                                           Eric Halperin
                                           Enforcement Director

                                           Richa Dasgupta
                                           Deputy Enforcement Director

                                           Michael Posner
                                           Assistant Litigation Deputy

                                           */s/ David Hendricks*
                                           David Hendricks
                                           Senior Litigation Counsel
                                           SC Bar No.: 10547
                                           Email: David.Hendrick@cfpb.gov
                                           Phone: 571-455-3209

                                           Gregory Nodler*
                                           Senior Litigation Counsel
                                           TX Bar No.: 24053395
                                           E-mail: Gregory.Nodler@cfpb.gov
                                           Phone: 202-435-7671

18

Fax: 202-435-7722

Amy R. Mix*
Senior Litigation Counsel
DC Bar No.: 483483
E-mail: Amy.Mix@cfpb.gov
Phone: 202-435-9924

Stephanie B. Garlock*
Counsel
DC Bar No.: 1779629
E-mail: Stephanie.Garlock@cfpb.gov
Phone: 202-435-7201

*Admitted pro hac vice